# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

7652 W. Leon Terrace #B
Milwaukee, Wisconsin

)
)
)  Case No. __17 M058__
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

SEE ATTACHMENT A.

located in the Eastern District of Wisconsin, there is now concealed:

SEE ATTACHMENT B.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:  Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jeffrey R. Milam, Special Agent, DEA
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: June 6, 2017

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin    The Honorable David E. Jones    U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## APPLICATIONS FOR SEARCH WARRANTS

I, Jeffrey R. Milam, being first duly sworn, hereby depose and state as follows:

## I.    BACKGROUND AND EXPERIENCE

1.    I am a Special Agent with the Drug Enforcement Administration (DEA), and have been so employed since September 2014. Prior to my current assignment, I was employed as a police officer with the St. Louis County Police Department in St. Louis, Missouri. During the last three years of my previous employment, I was a Task Force Officer with the DEA. I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.    During my tenure as a DEA agent, I have been involved primarily in the investigation of narcotics traffickers operating in the State of Wisconsin and throughout the United States. I have received training in the investigation of drug trafficking; I have has worked with informants in the investigation of drug trafficking; and I have participated in the application of and execution of numerous search warrants, narcotics investigations, and arrests in which controlled substances and drug paraphernalia were seized. Based on my training, experience and participation in drug trafficking investigations and associated financial investigation involving controlled substances, I know and have observed the following:

1

a.      I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b.      I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances;

c.      I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.      I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

e.      I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control;

f.      I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them;

g.      It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

2

h.     It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

i.     Likewise, it is common for businesses who engage in transactions with individuals involved in criminal activity to conceal the nature of the transactions through false records such as invoices, by maintaining false financial records, or placing the transaction in a nominee name. These businesses may need to keep these false records for inventory or bookkeeping reasons. However, these false records may be placed in a separate location such as a personal residence, safe, or safe deposit box for concealment.

j.     I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k.     I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

l.     I know that the Currency Transaction Report (CTR) (Fincen Form 104), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction that exceeds $10,000, causes tremendous problems with drug traffickers when they attempt to negotiate their illegal profits at a financial institution; I further know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

m.     I know drug traffickers commonly maintain addresses or telephones numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization; and

3

n.     I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices;

o.     Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or money laundering activities; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

3.     I am currently participating in an investigation of heroin and cocaine trafficking involving Kavanaugh COLEMAN, Joshua BROWN, Shadell BURKS, Alexander JENKINS, Kendrick DAVIS, Marcello MAYS, Olajawan VEASY and Omar TRIGGS, among others. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) Title

4

III wire intercepts of a telephone utilized by COLEMAN; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; and (c) information obtained from numerous witnesses, including confidential sources.

4.     This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is also based upon information gained from interviews with cooperating witnesses, and informants, whose reliability is established separately herein.

5.     The investigation to date has included traditional law enforcement methods, including, but not limited to: confidential informants, information from other law enforcement officers; recorded conversations; controlled buys; Title III wire intercepts; documentary evidence; physical surveillance; telephone records; electronic surveillance; and physical seizures. However, because this affidavit is submitted for the limited purpose of securing authorization for search warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search

5

warrants.

## II. PURPOSE OF AFFIDAVIT

6.　　This affidavit is submitted in support of applications for search warrants to seek evidence of conspiracy to distribute heroin and cocaine and the possession with intent to distribute and distribution of heroin and cocaine in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846, and for the following locations associated with COLEMAN, who has committed, is committing, and will continue to commit the above-listed offenses:

- **3050 N. Richards Street**; Milwaukee, Wisconsin

- **6030 N. 91st Street**; Milwaukee, Wisconsin

- **2349 S. 7th Street**; Milwaukee, Wisconsin

- **7652 W. Leon Terrace #B**; Milwaukee, Wisconsin

## III. FACTS SUPPORTING PROBABLE CAUSE

7.　　This investigation was initiated in July of 2016. To date, case agents have determined that a group of individuals, both known and unknown, are involved in a drug trafficking organization led by Kavanaugh COLEMAN, which case agents refer to as the "COLEMAN DTO." The COLEMAN DTO distributes large quantities of heroin and cocaine in and around the Milwaukee, Wisconsin metropolitan area. Case agents have developed multiple confidential sources who provided information regarding the COLEMAN DTO, and as set forth below, on numerous separate occasions between

6

August of 2016 and March of 2017, multiple confidential sources bought distribution quantities of heroin from COLEMAN and other member of the COLEMAN DTO. Before each deal, the confidential sources have placed a consensually recorded phone call to COLEMAN or a member of the COLEMAN DTO and ordered heroin. Additionally, confidential sources have provided historical information regarding the DTO, and their drug distribution activities. The investigation has further revealed that COLEMAN and other members of the COLEMAN DTO distribute both "dealer" or distribution quantities of heroin and "retail" or user quantities of heroin and cocaine. The investigation has further revealed that while COLEMAN sells heroin and cocaine from his vehicle, utilizing "rolling drug houses," COLEMAN also utilizes multiple residences as stash houses, including **3050 N. Richards Street, 2349 S. 7th Street,** and **7652 W. Leon Terrace #B**; and COLEMAN and other members of his DTO also conduct narcotics transactions and store heroin at **Economy Auto Body, 6030 N. 91st Street**, Milwaukee Wisconsin.

## A. Information Obtained from Confidential Sources

### 1. Information Obtained from CS-1

8. In July of 2016, case agents interviewed a confidential source of information (CS-1). CS-1 provided case agents with information regarding a drug trafficking organization that is operating in the City of Milwaukee and is distributing large quantities of heroin throughout the greater Milwaukee area. CS-1 identified several individuals involved in this organization, including Kavanaugh COLEMAN. CS-1 stated

7

that s/he has observed COLEMAN in possession of more than 20 kilograms of cocaine and CS-1 stated that between February and September of 2016 CS-1 observed COLEMAN sell more than 3 kilograms of heroin. CS-1 further stated that COLEMAN "fronts" cocaine and heroin to members of his drug trafficking organization (COLEMAN DTO) who then distribute street level and retail level quantities of heroin to their customers, that is, COLEMAN provides heroin and cocaine to members of his drug trafficking organization with the expectation that payment will be made after the drugs have been sold.

9. For several reasons, case agents believe that CS-1 is reliable and credible. First, CS #1 has been providing continuous information since May of 2016. Second, the information CS-1 has provided is substantially against CS-1's penal interest. Third, the information provided by CS-1 is consistent with evidence obtained elsewhere in this investigation where CS-1 was not utilized, and substantial portions of CS-1's information has been corroborated through independent investigation, including surveillance and information from other sources. For example, CS-1 stated that s/he contacted COLEMAN using (414) 519-1818 to purchase heroin, which was corroborated by toll records and information from other sources. Fourth, CS-1 has made statements to case agents that are against his/her penal interests, in that CS-1 has admitted his/her involvement in the COLEMAN DTO's activities in the past. Finally, CS-1 has had an adequate opportunity to observe directly the events discussed and/or has heard conversations directly from the individuals discussed herein. CS-1 has prior convictions for Possession

8

of THC, Possession with Intent to Deliver Cocaine, Fleeing/Eluding an Officer, and Receiving Stolen Property. CS-1 is currently on probation/parole status for his/her conviction of Possession with Intent to Deliver Cocaine. CS-1 is cooperating in exchange for financial benefits. To date, CS-1 has received $850.00 in exchange for his/her cooperation on this investigation. CS-1 has provided law enforcement with timely and accurate information corroborated by law enforcement through consensually recorded conversations, controlled buys, and other witness and law enforcement reporting. In November of 2016, case agents observed CS-1's vehicle during a controlled buy of heroin from COLEMAN. Case agents suspected that CS-1 delivered heroin to a drug customer on behalf of COLEMAN and this activity was not under the direction and control of law enforcement. Case agents subsequently approached CS-1 to inquire whether s/he had engaged in this unauthorized criminal activity and CS-1 admitted to engaging in unauthorized criminal activity. Since that time, CS-1 has continued to provide intelligence regarding the COLEMAN DTO to case agents and case agents continue to believe that the information provided by CS-1 about the COLEMAN DTO is truthful and reliable because it has been corroborated through independent investigation.

10.     CS-1 provided information regarding COLEMAN, aka "KG." CS-1 stated s/he had been inside of multiple residences owned by COLEMAN and has observed COLEMAN in possession of kilogram quantities of heroin and cocaine. CS-1 stated that s/he has personally observed COLEMAN engaged in large-scale drug trafficking as well

9

as street-level drug dealing. CS-1 stated that s/he has known COLEMAN for approximately 10 years and has known COLEMAN to be a drug dealer the entire time. CS-1 stated that COLEMAN is armed with a black in color, Glock brand, semi-automatic pistol, with extended 30 round magazine, when he is conducting drug transactions as he attempts to protect himself and his narcotics business from rival drug dealers and those who may be looking to rob him.

11.     CS-1 stated that COLEMAN has a source of supply in Chicago, Illinois and will meet with his source in Gurnee, Illinois twice a month to pick up kilogram quantities of heroin. CS-1 stated that COLEMAN has a network of drug traffickers that he provides heroin to that traffic heroin on behalf of COLEMAN. CS-1 stated that s/he has known COLEMAN for approximately 10 years and used to be business partners with COLEMAN in a cleaning business that both CS-1 and COLEMAN started with proceeds from narcotics trafficking. It was during this partnership that CS-1 began dealing in illegal narcotics trafficking with COLEMAN until 2013 when CS-1 was arrested and prosecuted for narcotics trafficking. CS-1 further stated that COLEMAN is a member of the Gangster Disciples street gang, which originated in Chicago, Illinois in the 1960s and further stated that COLEMAN has several close family ties to Chicago, Illinois and Gangster Disciple gang members in Chicago, Illinois.

12.     CS-1 stated that COLEMAN sells heroin for $90 to $100 per gram and stated that after COLEMAN obtains the kilograms of heroin, he typically takes those kilograms

10

of heroin to a house CS-1 identified as **3050 N. Richards Street**, Milwaukee, Wisconsin. CS-1 stated that COLEMAN owns **3050 N. Richards Street** and meets with other members of the COLEMAN DTO there and breaks down the heroin and prepares it for distribution to other members of the DTO at **3050 N. Richards Street**. CS-1 also stated that **3050 N. Richards Street** is equipped with a surveillance camera system that feeds to a computer screen in the living room area of the residence.

13. Case agents obtained public records, including records from the City of Milwaukee Assessor's Office, revealing that Kavanaugh Coleman is the current owner of **3050 N. Richards Street**. Case agents also conducted a utilities check, which listed COLEMAN as the occupant of **3050 N. Richards Street** since July of 2015. Additionally, during the course of the investigation case agents installed a pole camera on public property, which captured the front of **3050 N. Richards Street**. During monitoring of the camera, case agents consistently observed COLEMAN arriving at and entering **3050 N. Richards Street**. On one occasion, case agents observed a vehicle believed to be owned by Shadell BURKS, arrive in front of **3050 N. Richards Street** and then observed COLEMAN, and the driver (believed to be BURKS) exit the vehicle, and enter the front door to **3050 N. Richards Street**.

14. CS-1 further stated that COLEMAN owns several properties in the City of Milwaukee and uses various locations, including **3050 N. Richards Street** and **7652 W.**

11

**Leon Terrace,** as "stash houses," meaning locations where he will store narcotics, money, and weapons.

15.     CS-1 stated that CS-1 has purchased heroin and cocaine from COLEMAN more than 100 times in the past. CS-1 stated that COLEMAN typically "fronts" CS-1 the narcotics for payment later. CS-1 stated COLEMAN owns a silver Infiniti SUV QX56 and that COLEMAN commonly switches the rear plate to avoid detection from law enforcement because COLEMAN has fled from police several times in the past and that COLEMAN knows the Milwaukee Police Department has a no pursuit policy.

16.     CS-1 stated that an individual that goes by "Lil Josh," subsequently identified as Joshua L. BROWN, who is a heroin distributor for COLEMAN, currently lives at a house, which is owned by COLEMAN at **7652 W. Leon Terrace, Unit B,** Milwaukee, Wisconsin. CS-1 stated that COLEMAN used to store money and narcotics at **7652 W. Leon Terrace, Unit B.** CS-1 stated that COLEMAN was burglarized twice at this location. CS-1 stated COLEMAN lost $100,000 in the first burglary and $20,000 in cash and $60,000 to $80,000 in jewelry and narcotics in the second burglary. CS-1 stated that Brandon Jones was the person who conducted the second burglary. CS-1 stated this is what led to Jones shooting COLEMAN. CS-1 stated that Jones returned the money and jewelry to COLEMAN so that COLEMAN would not testify against him for the shooting. Case agents located Milwaukee Police Department reports, which revealed

12

that an unknown subject shot COLEMAN one time on August 6, 2016 in the area of W. Capitol Drive and N. 24th Street, Milwaukee, Wisconsin.

17.    Case agents obtained public records, including records from the City of Milwaukee Assessor's Office, revealing that Kavanaugh COLEMAN is the current owner of **7652 W. Leon Terrace, Unit B**, Milwaukee, WI.  Additionally, two of COLEMAN's businesses, Kavanaugh & Associates LLC and Upper Echelon Records LLC list **7652 W. Leon Terrace, Unit B** as their business addresses.  Case agents conducted a utilities check, which listed Joshua BROWN as the current occupant of **7652 W. Leon Terrace, Unit B**, since April of 2016.

18.    CS-1 further stated that JENKINS and Kendrick DAVIS got into a shootout with COLEMAN and Shadell BURKS near 38th and Good Hope in March or April of 2015.  CS-1 stated COLEMAN and JENKINS "had some words" over a dope phone, the next time they met up all of the guns came out, and people started shooting.  CS-1 stated no one was hit except for some houses.  CS-1 stated COLEMAN paid for repairs to all of the houses so that no one would snitch on him.  CS-1 stated that after that incident there was a meeting of COLEMAN DTO members at Conrad Davis' house off Townsend where everything was resolved.  CS-1 stated s/he was present and that everyone had guns at the meeting including AK-47s.

19.    On October 23, 2016, case agents were contacted by CS-1 who reported that COLEMAN was leaving the City of Milwaukee and headed to Gurnee, Illinois to meet

his source of supply. CS-1 stated that COLEMAN would contact CS-1 when he returned. On Monday, October 24, 2016, CS-1 contacted case agents and reported that COLEMAN had returned from meeting his source of supply in Gurnee, Illinois late on Sunday, October 23, 2016. CS-1 estimated it was around 11:30 pm to 12:00 am. CS-1 stated that COLEMAN called CS-1 and CS-1 met with COLEMAN in the area of N. 15th Street and W. Fiebrantz Street, Milwaukee, Wisconsin. During this meeting, COLEMAN handed CS-1 a plastic bag, which contained 2 empty kilogram wrappers for heroin and asked the CS to throw the bag away for him. CS-1 placed the bag in the trunk of his vehicle and then contacted case agents the following morning (10-24-16) at approximately 8:01 a.m. Case agents met with CS-1 at Milwaukee Police Department, District 5, Milwaukee, Wisconsin and took custody of the items after observing them to be two individual empty kilogram wrappers. The empty kilogram wrappers were sent to the FBI Laboratory in Quantico, Virginia for latent print analysis. In a report dated December 28, 2016, the FBI Laboratory obtained seven fingerprints from one of the kilo wrappers and one fingerprint from the other kilo wrapper. The report stated that the fingerprints belonged to COLEMAN.

20. CS-1 further stated that COLEMAN and members of his DTO utilize the **Economy Auto Shop**, located at **6030 N. 91st Street, Milwaukee, Wisconsin** to engage in the sale of heroin and cocaine. CS-1 further stated that s/he has observed multiple firearms at **6030 N. 91st Street** in the past and has observed firearms in the auto shop as

14

recently as November of 2016. CS-1 identified Khizri Mirzoev, the listed owner of **6030 N. 91st Street**, as an individual s/he only knew as "Izzy" and stated that Izzy would commonly sell firearms to convicted felons at **6030 N. 91st Street**. CS-1 further stated that when COLEMAN was on probation/parole status with the State of Wisconsin, COLEMAN would pay Khizry Mirzoev, aka "Izzy," $300 per week and in exchange, Mirzoev would provide COLEMAN a check stub to show his probation officer. CS-1 stated that COLEMAN never actually worked at the auto shop at this time, but rather, COLEMAN would only sell narcotics from the parking lot.

21.     Additionally, in May of 2017, a source of information (SOI) told case agents that s/he observed multiple sales of firearms to felons taking place inside **Economy Auto** at **6030 N. 91st Street**, including the sale of a fully automatic, AR-15 assault rifle. The SOI stated s/he has known the owner of the business, Khizri Mirzoev, since 2009, and has worked at the business both full, and part time. The SOI identified Kavanaugh COLEMAN as a drug dealer, who utilizes **6030 N. 91st Street** to distribute narcotics. The SOI has known COLEMAN since 2010. In the last 3 years, the SOI has observed COLEMAN to engage in drug dealing from the business parking lot of **6030 N. 91st Street**. The SOI has seen COLEMAN to be in possession of large quantities of heroin, and cocaine, as well as bulk U.S. currency.

22.     The SOI stated in 2014, COLEMAN directed the SOI to hide a backpack containing a large amount of heroin, cocaine, and U.S. currency inside of a vehicle that

15

was parked in the business lot of **6030 N. 91st Street**. The SOI stated s/he has observed over 100 instances, where COLEMAN, and other co-conspirators conducted drug deals in the business lot of **6030 N. 91st Street**. The SOI stated that s/he had conversations with the owner of the business, Mirzoev, regarding the drug dealing activities in the business lot and how it may attract the attention of law enforcement. The SOI stated Mirzoev told the SOI not to worry about it.

23. The SOI identified Shadell BURKS, Alexander JENKINS, Joshua BROWN, and Kendrick DAVIS, as all being involved in drug dealing on the business lot of **6030 N. 91st Street**. The SOI further stated in 2015, s/he directly observed the owner of the business (Mirzoev) sell a 10 mm Glock pistol to JENKINS, who is a convicted felon. Case agents believe the information provided by the SOI to be truthful and reliable because the SOI has provided information, which case agents have been able to corroborate through surveillance, controlled buys, and other witness and law enforcement reporting. The SOI provided this information anonymously and without any expectation of monetary gain.

**2. Information Obtained from CS-2**

24. In September of 2016, a confidential source (CS-2) began providing information to case agents regarding COLEMAN. CS-2 stated that s/he has known COLEMAN for approximately 15 years and recently started purchasing heroin from COLEMAN. CS-2 further stated that s/he has personally observed COLEMAN driving

16

around the greater Milwaukee area in possession of approximately 200 grams of heroin and 9 ounces of crack/cocaine, all of which was packaged for street distribution. CS-2 further stated that s/he has observed COLEMAN possess firearms in connection with his drug trafficking and stated that COLEMAN typically carries a firearm.

25.    For several reasons, case agents believe that CS-2 is reliable and credible. First, CS-2 has been providing continuous information since May of 2016. Second, the information CS-2 has provided is substantially against CS-2's penal interest. Third, the information provided by CS-2 is consistent with evidence obtained elsewhere in this investigation where CS-2 was not utilized, and substantial portions of CS-2's information has been corroborated through independent investigation, including surveillance and information from other sources. For example, CS-2 stated that COLEMAN had recently purchased an Infiniti Q70 vehicle and provided information regarding other vehicles driven by COLEMAN and used by COLEMAN to distribute heroin and cocaine; all of which was corroborated by surveillance, other confidential sources, and law enforcement reports. CS-2 was arrested in May of 2016 on a state felony narcotics transaction and is cooperating for consideration on that charge. CS-2 does not have any prior convictions. Finally, CS-2 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. For these reasons, case agents believe CS-2 to be reliable.

26.    CS-2 stated that he/she has known COLEMAN for approximately 15 years

17

and knows that COLEMAN uses the nickname "KG". CS-2 stated that approximately 3 to 4 months prior to November of 2016, COLEMAN approached CS-2 on several occasions and COLEMAN advised CS-2 that he could supply him/her with quantities of heroin. COLEMAN told CS-2 that he supplies two types of heroin, one for $90 per gram and one for $100 per gram. CS-2 stated that in addition to heroin, CS-2 knows that COLEMAN deals in large quantities of cocaine. CS-2 stated that he/she has personally observed COLEMAN driving around the greater Milwaukee area and in possession of a large gallon-size, Ziploc bag, containing approximately 200 grams of heroin and approximately 9 ounces of cocaine and crack cocaine. CS-2 stated that the heroin, cocaine, and crack cocaine are broken down into smaller distribution quantities for users and COLEMAN has plastic baggies and a scale inside of his vehicle at all times.

### 3. Information Obtained from CS-3

27.        In May of 2017, case agents interviewed a confidential source (CS-3), who stated that s/he has purchased 5 to 10 grams of heroin per week from COLEMAN from December of 2016 through April of 2017. CS-3 further stated that s/he has observed COLEMAN to have between 200 and 300 grams of heroin on his person on multiple occasions. CS-3 further stated that s/he has personally observed COLEMAN to always be armed with a black in color Glock, semi-automatic pistol while he conducts his heroin and cocaine trafficking. CS-3 also stated that COLEMAN owns several properties in the City of Milwaukee, including one in the area of N. Richards Street and E. Burleigh Street,

18

and another property located near S. 7th Street and W. Hayes Street. CS-3 stated that on two occasions, s/he has personally observed COLEMAN "breaking down" between 2 and 3 kilograms of heroin at the house in the area of N. Richards Street and E. Burleigh Street, which is a "stash house" known to case agents to be **3050 N. Richards Street**. CS-3 stated that s/he has observed COLEMAN breaking down kilograms of heroin for further distribution at **3050 N. Richards Street** in the past six months. CS-3 stated that the residence on N. Richards Street (**3050 N. Richards Street**) is not fortified; however, it is equipped with a camera system. Furthermore, CS-3 stated that s/he also knew about a residence used by COLEMAN for drug trafficking in the area of S. 7th Street and W. Hayes Street, Milwaukee, Wisconsin, which case agents know to be **2349 S. 7th Street**, which Kavanaugh COLEMAN is also the listed owner. Case agents obtained public records, including records from the City of Milwaukee Assessor's Office, revealing that Kavanaugh Coleman is the current owner of **2349 S. 7th Street, Milwaukee WI**.

28. Case agents conducted a utilities check, which revealed that **2349 S. 7th Street, Milwaukee, WI** appears to be currently vacant. The previous tenant terminated utilities in April of 2017. Given COLEMAN's ownership of the residence since 2013; and physical surveillance of COLEMAN's vehicle at the residence several times in the last two months, including COLEMAN's arrival at **2349 S. 7th Street, Milwaukee, WI** following his return from Gurnee, IL on March 30, 2017; case agents believe COLEMAN continues to utilize **2349 S. 7th Street, Milwaukee, WI** as a "stash" house.

19

29.     For several reasons, case agents believe that CS-3 is reliable and credible. First, CS-3 has been providing continuous information since May of 2017. Second, the information CS-3 has provided is substantially against CS-3's penal interest. Third, the information provided by CS-3 is consistent with evidence obtained elsewhere in this investigation where CS-3 was not utilized, and substantial portions of CS-3's information has been corroborated through independent investigation, including surveillance and information from other sources. CS-3 is cooperating for consideration on potential federal heroin trafficking charges and is currently on supervised release for a prior federal cocaine trafficking conviction. CS-3 has prior federal convictions for drug trafficking. Finally, CS-3 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. For these reasons, case agents believe CS-3 to be reliable.

**B.     Controlled Buys**

30.     Throughout the course of the investigation of the COLEMAN DTO, case agents have made several controlled buys of cocaine and heroin from members of the DTO. Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, s/he is searched for contraband, weapons, and money before the operation. The informant is also wired with

a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is then field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. All of the calls to the target by the informants are consensually recorded calls under the direction and control of case agents and made in the presence of case agents. Additionally, case agents observe the informants dial the target's number on each occasion and the contact is verified through telephone records.

31. On August 19, 2016, acting under the direction and control of case agents, CS-1 conducted a controlled buy of approximately 4 grams of heroin from COLEMAN at the address of 6675 N. 58th Street, Milwaukee, Wisconsin. CS-1 placed a call to the number of 414-519-1818 and spoke with COLEMAN. CS-1 ordered 4 grams of heroin and was directed by COLEMAN to meet him at the **Economy Auto Body Shop, 6030 N. 91st Street**, Milwaukee, Wisconsin. While en route, COLEMAN called CS-1 from 414-519-1818 and changed the address of this transaction to the area of N. 58th Street and W. Mill Road, Milwaukee, Wisconsin. CS-1 was then observed by surveillance units to arrive at the approximate address of 6675 N. 58th Street. Surveillance units observed a silver Infiniti

21

SUV arrive in the area and park across the street from CS-1. During the controlled buy, COLEMAN was the operator and sole occupant of a silver Infiniti SUV with Wisconsin dealer plate of MV4612. CS-1 entered into the front passenger side of the vehicle and obtained heroin from COLEMAN, who "fronted" the CS the heroin for payment later. The suspected heroin tested positive for the presence of opiates, with a weight of 3.69 grams.

32.    On September 22, 2016, acting under the direction and control of case agents, CS-2 conducted a controlled buy of heroin from COLEMAN. CS-2 placed a consensually monitored phone call to COLEMAN at 414-519-1818. During the conversation, CS-2 ordered heroin from COLEMAN and COLEMAN directed CS-2 to meet him at **6030 N. 91st Street**, which is the **Economy Auto Shop**. During the controlled buy, surveillance units, who were already in the area, observed CS-2 drive into the lot of the **Economy Auto Shop, 6030 N. 91st Street,** and park next to a black Cadillac Escalade. Surveillance units then observed COLEMAN approach the driver side of CS-2's vehicle and conduct a hand-to-hand narcotics transaction with CS-2. The heroin CS-2 purchased from COLEMAN tested positive for opiates with a weight of 14.2 grams.

33.    On December 13, 2016, CS-2 conducted a controlled buy of approximately 14 grams of heroin from COLEMAN at the **Economy Auto Body** located at **6030 N. 91st Street**, Milwaukee, Wisconsin. At approximately 3:20 p.m., case agents met with CS-2 at a predetermined location. CS-2 told case agents that CS-2 had received a text message

22

on December 12, 2016, from telephone number 414-758-9559, which COLEMAN identified as his new number. CS-2 saved the new number and deleted the test message. CS-2 then placed a recorded telephone call to COLEMAN at 414-748-9559. CS-2 told COLEMAN CS-2 wanted to grab 14 (14 grams of heroin) from him. COLEMAN replied, "I'm up at the shop (Economy Auto Body) on 91st for real." CS-2 then asked COLEMAN what CS-2 needs to spend in order to get a reduced price per gram. COLEMAN replied, "Man, I ain't gonna lie... I can't even move on that shit (lower the price)... I leave that shit alone, cuz I ain't making shit (low profits)." COLEMAN told CS-2 "I buy shit thousands of them motherfuckers (meaning grams of heroin) and they (source of supply) want $90 per gram."

34. CS-2 stated that after meeting with case agents, CS-2 drove to the Economy Auto Body at **6030 N. 91st Street** and parked on the street in front of the building. CS-2 stated CS-2 observed a dark green (black) Infiniti QX70 parked in the lot. Due to the heavy window tint, CS-2 approached the passenger door of the vehicle. CS-2 stated as CS-2 opened the passenger side door of the vehicle, CS-2 observed a black male. CS-2 told the male CS-2 was looking for "Big Bro." The black male stated he would call COLEMAN. CS-2 stated he did not know the name of the black male but had observed him on previous meetings with COLEMAN. CS-2 stated the black male was wearing a black and red baseball cap, a black and red coat, and black pants with red studs on them. Based on previous reporting by other confidential informants and the make and model

23

of the black Infiniti SUV, case agents believe this individual to be BURKS. CS-2 stated CS-2 shut the front passenger door to the vehicle and approached and entered the front entrance of **Economy Auto Body**. CS-2 stated inside the auto body shop CS-2 observed numerous foreign vehicles and observed two white males in close proximity to an Oldsmobile Cutlass Supreme. CS-2 stated that COLEMAN then called to CS-2 from underneath the Cutlass, which COLEMAN appeared to be working on. CS-2 observed that the male subject, believed to be BURKS, had followed CS-2 into the shop as well. CS-2 stated that the male subject, believed to be BURKS, was holding a clear plastic baggie in his hand. CS-2 stated CS-2 handed the male subject, believed to be BURKS, the buy money and this individual handed CS-2 the clear plastic baggie containing the heroin. CS-2 stated s/he then exited the **Economy Auto Body** shop. CS-2 was later shown a Wisconsin Department of Transportation photograph of Shadell BURKS. CS-2 stated that CS-2 was 50 to 60 percent positive that BURKS was the person who handed CS-2 the heroin.

35.     On February 9, 2017, at approximately 4:30 p.m. SYKES walked into the emergency room of Saint Joseph's Hospital, 5000 West Chambers Street, Milwaukee, Wisconsin. Sykes was suffering from a through and through gunshot wound to his upper left thigh. Sykes told Milwaukee Police Detective Michael Martin that when the incident occurred he was at the Economy Auto Repair and Auto Body, located at **6030 North 91st Street**, Milwaukee, Wisconsin. SYKES stated that he was with Kavanaugh COLEMAN,

24

who SYKES knows as "KG" just prior to being shot by an individual known to SYKES as "Wax." After being shot, SYKES stated that Khizri Mirzoev, the owner of the Economy Auto, drove him to the hospital. SYKES did not provide officers with an explanation as to why "Wax" shot him. Mirzoev told investigating officers that he did not witness the shooting, but drove SYKES to the hospital. Mirzoev told officers that SYKES is a friend of COLEMAN, who Mirzoev also knows as "KG." COLEMAN did not remain at the scene and has not been interviewed regarding this incident. On February 14, 2017, Milwaukee Police Detective Michael Martin showed SYKES a photo array in which JENKINS aka "Wax" was the target. Detective Martin utilized the State of Wisconsin, Department of Justice best practice method when showing SYKES the photo array. SYKES positively identified JENKINS as the individual who shot him on February 9, 2017. JENKINS was subsequently charged with 1st-Degree Recklessly Endangering Safety and Possess Firearm-Convicted of a Felony in Milwaukee County Circuit Court Case No. 2017-CF0-01004. On February 27, 2017, JENKINS posted $25,000 cash bond and was released from the Milwaukee County Criminal Justice Facility on bond.

36.     Case agents listened to jail calls made from the Milwaukee Criminal Justice Facility and heard JENKINS, aka "Wax," make a three-way phone call, using another inmate's pin number, to SYKES. During one call, JENKINS is heard telling SYKES that he is going to "cash him out" to drop the shooting charges against him or in JENKINS words, "get him out the way." JENKINS inquires when "Mychal" is going to the District

25

Attorney's Office and if he needed a ride there. JENKINS is heard stating he would pay SYKES between five to ten thousand dollars total in order not to testify against JENKINS.

37. After the shooting of SYKES by JENKINS, CS-1 stated that COLEMAN told him that JENKINS shot SYKES because he was upset with SYKES because SYKES had stolen a cell phone from him that contained numbers for his drug customers. CS-1 further stated that COLEMAN told CS-1 that he was going to call a meeting for members "of the group" and was going to put an end to the "drama going on." CS-1 stated COLEMAN told him that he would not allow any retaliation by SYKES against JENKINS because it would attract too much attention from law enforcement and would be "bad for business."

**C.    Wire Intercepts and Surveillance**

38. On March 21, 2017, case agents monitoring the Title III intercept of COLEMAN's telephone intercepted conversations between COLEMAN and an alleged drug customer regarding a drug deal/money transaction at **6030 N. 91st Street.** Surveillance was established at **6030 N. 91st Street**, as investigators observed COLEMAN's vehicle parked on the business lot. Minutes later, another vehicle arrived. Case agents observed COLEMAN briefly meet with the driver of the other vehicle in the business lot of **6030 N. 91st Street** before departing same. Based upon their training and experience and the investigation to date, case agents believe COLEMAN was conducting a narcotics transaction with the driver of the other vehicle.

39. On March 21, 2017, investigators monitoring the Title III intercept of

26

COLEMAN's telephone intercepted conversations between COLEMAN and a female heroin customer regarding a drug transaction near **3050 N. Richards Street**. Surveillance units later observed COLEMAN standing in the roadway near **3050 N. Richards Street**, attempting to flag down a vehicle, which case agents believed to be the heroin customer. The customer eventually parked behind a vehicle previously occupied by COLEMAN, which was parked directly in front of **3050 N. Richards Street**, and case agents observed COLEMAN conduct a hand-to-hand transaction with the driver of the vehicle. As the customer departed, case agents observed COLEMAN walk back toward **3050 N. Richards Street**; however, case agents were unable to see if COLEMAN entered **3050 N. Richards Street** immediately after the deal.

40.     On March 25, 2017, case agents monitoring the Title III intercept of COLEMAN's telephone intercepted conversations between COLEMAN and BROWN. BROWN tells COLEMAN that a female is outside yelling that somebody is selling drugs in the building. COLEMAN later tells BROWN he will call back, and says "let me call off in the car Ed (call Ed), and …call you right back." COLEMAN immediately calls "Edna" and asks her what is going on. Edna states she didn't notice anything happening outside. Immediately thereafter, COLEMAN calls BROWN who stated "there [are] police on the side of my window." BROWN continues "whatever she did, she hit my window. COLEMAN tells BROWN that if BROWN heard banging (police knocking on doors) … that was in the building behind you. BROWN continued, "When the police flashed their

27

lights in, I'm in the bed like, what the fuck." COLEMAN then replies that, "She said she can guarantee you sell drugs?" COLEMAN and BROWN continue to discuss who the female might be and why she is telling the police about drugs being sold at the building. Based upon their training and experience and the investigation to date, case agents believe that during these calls BROWN is alerting COLEMAN of a potential witness alerting police to his drug trafficking activity and BROWN is also warning COLEMAN of a police presence at one of his "stash" locations, that is **7652 W. Leon Terrace #B**, Milwaukee, WI.

41.     On March 29, 2017, case agents conducting surveillance of COLEMAN observed his vehicle, a black Camaro that was rented by COLEMAN, parked in a rear alleyway near **2349 S. 7th Street.** On March 30, 2017, case agents were monitoring court-authorized location information for a telephone utilized by COLEMAN. The location information showed COLEMAN traveling south towards the Wisconsin/Illinois border and based upon the information provided by confidential sources, their training and experience and the investigation to date, case agents believed COLEMAN was traveling to Illinois meet his heroin source of supply. Case agents monitored the location information for COLEMAN's telephone which revealed that it traveled to Gurnee, Illinois, which is where CS-1 stated COLEMAN met with his source to obtain heroin. Case agents were unable to locate COLEMAN's vehicle until he began traveling back north towards Wisconsin. Case agents surveilled COLEMAN into north Milwaukee,

28

where COLEMAN began conducting counter surveillance, including stopping in the middle of roadway, conducting U-turns, and case agents therefore terminated surveillance of the vehicle for a short period of time. Additional surveillance units then set up surveillance at **2349 S. 7th Street** and later observed COLEMAN park his vehicle in the rear alley and enter **2349 S. 7th Street** from the rear door. Minutes later, case agents observed COLEMAN exit the rear door to **2349 S. 7th Street,** and depart in the black Camaro. On April 1, 2017, case agents again observed the black Chevrolet Camaro (rented by COLEMAN) parked in front of **2349 S. 7th Street.**

42. On May 5, 2017, the Honorable Pamela Pepper, United States District Judge for the Eastern District of Wisconsin, signed an order authorizing the interception of electronic communications over the cellular telephone number 414-745-2347, which is used by COLEMAN. Judge Pepper's order also included authorization for law enforcement to obtain location information for 414-745-2347 (COLEMAN's phone). Location information for 414-745-2347, COLEMAN's phone, reveals that between May 5, 2017 and May 31, 2017, the phone registered off a cell tower located in close proximity to **2349 S. 7th Street** on approximately 56 occasions. Location information for COLEMAN's phone further reveals that between May 5, 2017 and May 31, 2017, COLEMAN's phone registered off a cell tower located in close proximity to **3050 N. Richards Street** on approximately 260 occasions; registered off a cell tower located in close proximity to **7652 W. Leon Terrace** on approximately 16 occasions; and registered off a cell tower located

29

in close proximity to **6030 N. 91st Street** on 54 occasions. Case agents also observed COLEMAN, who was driving a Gray Toyota Tundra, at **6030 N. 91st Street** on multiple occasions during May of 2017. Additionally, on June 2, 2016, case agents observed COLEMAN's vehicle in the lot of **6030 N. 91st Street** and observed COLEMAN exit Economy Auto body, enter his vehicle and depart the area.

43. Based upon their training and experience and the investigation to date, case agents are aware that drug traffickers commonly maintain evidence of their drug trafficking, including drug ledgers, financial documents, U.S. currency, cellular telephones, customer contact information, jewelry or other items purchased with drug proceeds, in their homes or "stash" houses. Case agents are also aware it is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. Because narcotics trafficking generates large sums of cash, it requires the keeping of detailed records as to the distribution of narcotics as well as the laundering of the proceeds. Such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the narcotics proceeds on behalf of the organization. These records, unlike controlled substances, are often maintained for long periods of time, even several years, based on case agents' training and experience. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

30

44. Review of Title III intercepts of 414-745-2347, COLEMAN's phone, reveals that on May 12, 2017 at 5:25 p.m., COLEMAN placed an outgoing call to Michael SYKES at telephone number 414-610-7575. COLEMAN and SYKES discuss where they are currently located and COLEMAN tells SYKES he is going to need a little dope. SYKES tells COLEMAN "I got you." Based upon case agents' review of the preliminary transcript of the call, their training and experience, and the investigation to date, COLEMAN is asking SYKES for narcotics and SYKES tells COLEMAN he will obtain narcotics on his behalf.

45. On May 13, 2017 at 9:16 p.m., COLEMAN received an incoming call from 414-315-1471 and spoke to Cory L. GRIFFIN. GRIFFIN tells COLEMAN he is just really getting back out and he just went back to a location and "broke something down and then got back out there." GRIFFIN tells COLEMAN that "Gucci's cousin" is acting like he is ready so GRIFFIN is going to try him out. GRIFFIN then tells COLEMAN that this individual is always pulling up on him asking for "a four" and that yesterday GRIFFIN told him why would you want to buy four when you could sell 20 or 30 balls (a ball is 3.5 grams of cocaine) a day for me. GRIFFIN tells COLEMAN he told this individual that if you buy four what kind of profit are you going to see when you hold it for three days or something. GRIFFIN tells COLEMAN that he is going to go ahead and take a road trip tomorrow morning because he just got the call today from "Cuz." COLEMAN asks GRIFFIN what time he is getting out of here and GRIFFIN tells COLEMAN as soon as he

31

wakes up. GRIFFIN tells COLEMAN he might wait until Monday to ride with rush hour. COLEMAN tells GRIFFIN that is how he likes to do it. COLEMAN asks GRIFFIN what he has going. GRIFFIN tells COLEMAN probably three or four sheets (three or four kilograms). Based upon my training and experience and the investigation to date, case agents believe that "sheets" is code for kilograms of cocaine.

46.     Later in the conversation, COLEMAN tells GRIFFIN he is probably going start off with at least a deuce (meaning two kilograms) and says a lot of it is already pre-sold and people are just waiting on him. COLEMAN tells GRIFFIN that he needs a little sheet (one kilogram of cocaine) for his people. COLEMAN tells GRIFFIN make sure you don't leave my cash here. GRIFFIN tells COLEMAN that he isn't going to leave any cash around. COLEMAN tells GRIFFIN he needs to make a great impression when GRIFFIN goes to see "Cuz." GRIFFIN tells COLEMAN that "Cuz" pretty much started it off and started "Stu" off with a hundred (100 grams of cocaine) and watched him go to two thousand (two kilograms of cocaine) in about two months. Based upon my review of the preliminary transcript of the call, my training and experience, and the investigation to date, case agents believe GRIFFIN is planning on purchasing three to four kilograms of cocaine from "Cuz" on Monday, May 15, 2017.

47.     On May 18, 2017 at 5:03 p.m., COLEMAN received an incoming call from GRIFFIN. GRIFFIN tells COLEMAN that he "aint even fuck with it man." COLEMAN asks GRIFFIN what are you waiting on? GRIFFIN then tells COLEMAN that he was

32

going to go out that way but decided not to go. GRIFFIN tells COLEMAN that they shut down "the hole." GRIFFIN then tells COLEMAN that they said "if yall aint got the electric on by tomorrow . . . yall pretty much done man. Yall gotta get the fuck up outta here." GRIFFIN and COLEMAN then agree to meet at an undisclosed location. Based upon case agents' review of the preliminary transcript of the call, their training and experience, and the investigation to date, COLEMAN is asking GRIFFIN if he went to Chicago to pick up heroin. GRIFFIN tells COLEMAN "he didn't go." Case agents know this to be inaccurate. On May 15, 2017, case agents followed GRIFFIN to North Lake, IL where he met with an unidentified individual. Case agents conducted a vehicle stop of GRIFFIN when he was returning and seized $10,000 in cash and the rental vehicle GRIFFIN was driving. On May 16, 2017, case agents executed a search warrant on the rental vehicle GRIFFIN was driving and recovered approximately 200 grams of compressed heroin.

## IV. CONCLUSION

48. Case agents believe, based on the facts contained within this affidavit, that there is probable cause to believe that the locations described in paragraph 6 and more fully described in Attachment A, have been and are continuing to be used as part of a conspiracy to possess with intent to distribute heroin, the possession with intent to distribute heroin, and the distribution of heroin, all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 841(b)(1)(C) and 846 and furnishing of firearms to

33

felons in violation of Title 21, United States Code, Section 922(d)(1). Based on the foregoing, there is probable cause to believe that located within the locations described in paragraph 6 above and more fully described in Attachment A, there is evidence pertaining to the fruits, instrumentalities, and proceeds of drug trafficking or firearm trafficking, all of which are detailed more specifically in Attachment B, Items to be Seized.

Case 2:17-mj-00058-DEJ    Filed 06/19/17    Page 35 of 37    Document 1

## ATTACHMENT A

**7652 W. Leon Terrace #B; Milwaukee, Wisconsin** is a single unit of a multi-unit brown brick condominium with brown trim. The address 7652 is displayed in print above the front door, which faces west, and has #B displayed above the door.



## ATTACHMENT B
## ITEMS TO BE SEIZED

All records relating to violations of 21 U.S.C. §§ 841(a)(1) and 846, including but not limited to:

> All bank records, checks, credit card bills, account information, and other financial records;

> Financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

> Lists of drug customers and related identifying information;

> Types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;

> Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

> Indicia of residency;

> Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

> U.S. Currency; and

> Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).